UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NORCOTT CORBY, aka Corby Norcott,

        Petitioner,

  -v-

DALE ARTUS, Superintendant Clinton
Correctional Facility,

        Respondent.

No. 06 Civ. 15291 (LTS)(KNF)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __2 4 MAR  2011__

## OPINION AND ORDER

APPEARANCES:

THE LEGAL AID SOCIETY
 By: Alan S. Axelrod, Esq.
Criminal Appeals Bureau
199 Water Street, 5th floor
New York, NY 10038

*Attorney for Petitioner*

DISTRICT ATTORNEY NEW YORK
COUNTY
 By: Elizabeth Anne Squires, Esq.
One Hogan Place
New York, NY 10011

*Attorney for Respondent*

LAURA TAYLOR SWAIN, United States District Judge

Copies mailed/faxed to____  KR   Axelrod
Chambers    Swain
                3 - 24 -11

Petitioner Norcott Corby ("Corby") brings this habeas corpus petition (the "Petition") pursuant to 28 U.S.C. § 2254 challenging his convictions in New York State Supreme Court, New York County, of one count of murder in the second degree and one count of robbery in the first degree. Corby asserts that the trial court deprived him of his federal constitutional right to confrontation when it limited his cross-examination of the principal prosecution witness. This Court referred the matter to Magistrate Judge Kevin Nathaniel Fox who, on September 10, 2008, issued a Report and Recommendation (the "Report") recommending that the Petition be denied. A timely objection to the Report (the "Objection") was received from the Petitioner, who also filed a Supplemental Memorandum of Law (the "Supplemental Memorandum"). This Court has thoroughly considered all of the parties' submissions. For the reasons that follow, the Court declines to adopt the Report and grants the Petition.

**BACKGROUND**

The following facts are drawn from the trial testimony of the principal prosecution witness, Xanderia Burnett ("Burnett"), unless otherwise noted. Burnett was the tenant of the upper Manhattan apartment where Yousef Mohammed ("Mohammed") was murdered. Tr. 460.[1] In January of 1996, Burnett saw Corby at a bar, and he offered to pay Burnett $1,500 if she would allow him to use her apartment to meet up with a friend. Tr. 469-71. Corby was the ex-boyfriend of Burnett's mother, and Burnett knew him reasonably well. Burnett understood that, in fact, her apartment was going to be used for a drug deal, but she agreed to the proposal. Tr. 471-72. The morning after meeting her at the bar, Corby and one of his accomplices, whom Burnett knew as "Moe," moved into her apartment temporarily. Tr. 479. About a week and a half later, Corby told

---

[1]     Citations to "Tr.___" refer to the trial transcript.

Burnett that a person named Mohammed was in town, and she went with Corby to meet Mohammed at his hotel. After that initial visit, Burnett and Corby left Mohammed at the hotel, and returned to Burnett's apartment. Tr. 489-90.

Some days later, on January 22, 1996, Moe and "Farrow" (another accomplice of the defendant who joined the group that day) drove from Burnett's apartment to Mohammed's hotel with Burnett in one of the cars. Tr. 498. The group picked up Mohammed, and they all drove back to Burnett's apartment. After they arrived, Burnett and Corby left again to visit Corby's parole officer, while Mohammed, Moe and Farrow remained in the apartment. Tr. 501. When Burnett and Corby returned from the visit with the parole officer, Moe and Farrow were sitting in the living room and watching television. Burnett asked where Mohammed was, but no one answered her. Tr. 502. Corby then asked Moe and Farrow if they had "the key," at which point the three men went into a bedroom closing the door behind them. Id. After a short period of time, the men emerged from the bedroom, and Corby told Burnett to accompany him to Mohammed's hotel to help him "carry some drugs back." Tr. 503. Burnett saw Corby let himself into Mohammed's hotel room with a key and then locate and remove a number of taped up brown bags which Burnett believed contained heroin. Tr. 505. When the two returned with the drugs, Corby, Moe and Farrow again went into the bedroom where they had previously met, and spent fifteen minutes with the door closed. Tr. 512. When they reemerged from the bedroom, they left the door ajar and, upon passing by the room to use the bathroom, Burnett noticed Mohammed's body face down on her son's bed with a bleeding head wound. Tr. 513. Burnett then asked Corby what had happened and was told that she should "calm down" or else she would "be dead too." Tr. 514. The three men divided up the drugs among themselves and demanded that Burnett help them remove the body from the apartment and clean up afterward, both of which she did. Tr. 515.

Corby continued to live in Burnett's apartment until the April following the murder, when he was arrested for an unrelated parole violation. Burnett never reported the murder of Mohammed to the police because, she said, she was afraid of what Corby might do to her or her family. Tr. 520. She also stole some of Corby's money when he went to jail. Tr. 725. In January of 1997, when Burnett heard that Corby was being released from jail, she moved out of state. Tr. 521.

The detective investigating the murder, Detective Bourges ("Bourges"), met Burnett for the first time when he came to her apartment on February 2, 1996. Tr. 522; People v. Norcott, 15 A.D.3d 14, 28 (N.Y. App. Div. 2004) (Andrias, J., dissenting). The police had traced Mohammed's murder to Burnett based on returned checks that had been sent to Mohammed at Burnett's address, and because Mohammed had given her name and address for bank accounts that he had opened before his death. Tr. 535. Burnett did not disclose anything related to the homicide or the drug deal to Bourges at that time. Tr. 528. Burnett later testified that she had not said anything then because Corby, who was with her in the apartment, had threatened to harm her son, if she said anything. Id.

In April 1998, Corby went to Detective Robert Hom ("Hom") of the Drug Enforcement Agency ("DEA"), offering to serve as a paid informant. People v. Norcott, 15 A.D.3d at 29 (Andrias, J., dissenting). Hom did not accept the offer. A week later, Corby provided information about various narcotics transactions and murders, telling Hom that it was Burnett and her cousin who killed Mohammed and that he had just assisted them in removing the body. Id. After speaking to Hom, Bourges visited Burnett again in July in 1998. He first showed Burnett photographs of the defendant and Mohammed, among others. Burnett said that she recognized Corby but did not recognize Mohammed. Id. Bourges then told Burnett that

Corby had said that Burnett was responsible for Mohammed's murder, at which point Burnett "broke down" crying and told Bourges and his partner that Corby had committed the murder. Id. Burnett accompanied Detective Bourges to the police station and made a statement implicating Corby, Moc and Farrow in the murder and robbery of Mohammed. Id. at 30. Corby was arrested the following October. Tr. 538.

At Corby's trial, defense counsel sought, during Burnett's cross-examination, to elicit testimony that (1) in response to Detective Bourges' renewed request for information relating to the murder in July of 1998, Burnett had first denied having any information about the murder; (2) that Detective Bourges then told Burnett that Corby had implicated her in the murder; and (3) that only after she heard that Corby had accused her, did she then implicate him in the murder. People v. Corby, 6 N.Y.3d 231, 237 (N.Y. 2005) (G.B. Smith, J., dissenting); Tr. 685. The defense argued that this testimony would demonstrate to the jury that Burnett had a specific motive to lie to implicate the defendant in the murder, in order to shift the blame from herself to the man who had accused her of the crime. Tr. 685-86. Detective Bourges had confronted her, not with his own belief that Burnett committed the murder, but with the statement that Corby said she had. Tr. 689. As defense counsel told the judge outside the hearing of the jury:

> What I'm trying to do is place my client's guilt in doubt, not at this juncture by merely impeaching her credibility but by trying to show that what she did was to try to throw guilt on someone else. Motive to lie was clear, the jury has the right to know what the motive to lie is. She was asked a certain series of questions, and not just asked questions but was accused of having committed the crime by Bourges.

Tr. 686. The prosecution argued that the defense was trying to take this accusation out of context and "basically trying to put Mr. Corby's defense before the jury in the form of his questions" and

"to put a spin" on it that "suggests that accusations were made when in fact they weren't." Tr. 693. The prosecutor argued further "I think what [the defense lawyer] wants and he's seeking to get is that which he cannot get otherwise, which is to have the defendant's statement, self-serving declaration, before this jury in the form of questions put to the witness." Tr. 711.

After an extended colloquy between the defense and the prosecution outside the presence of the jury, the trial court prohibited the defendant from engaging in this line of inquiry. Tr. 686-714. It held that asking Burnett about what Detective Bourges told her would introduce the defendant's self-serving, out-of-court statement and would invite the jury to speculate that Burnett was the murderer, thus causing confusion and severely prejudicing the People's case. Tr. 714-20. The court also emphasized that petitioner's counsel had been given "every latitude" in cross-examining Burnett to establish her "motive to lie." Tr. 686-720.[2] At the close of the trial, the jury convicted Corby of both counts charged in the indictment. He was sentenced to concurrent terms of imprisonment, the longer of which was 25 years to life.

Corby appealed his conviction, arguing that he had been denied his constitutional right to effectively cross-examine an opposing witness; that the verdict was not based on legally sufficient evidence and did not fully comport with the weight of the evidence; and that the trial court had denied him due process of law by failing to instruct the jury that, in order to be found guilty, Corby had to have formed the necessary mental culpability for robbery prior to the time the act actually occurred. See Brief for Defendant-Appellant to the New York Supreme Court Appellate Division, Nov. 2003. On December 16, 2004, the Appellate Division affirmed

---

[2]     After the court prohibited trial counsel from pursuing this subject of inquiry with Burnett, defense counsel asked to be allowed to pursue it when cross-examining Bourges – which request was also denied. People v. Norcott, 15 A.D.3d at 31 (Andrias, J., dissenting).

Corby's conviction after deciding that any error committed by the Supreme Court was harmless:

> By no means do we deny the centrality of Burnett's testimony to the People's case; as the prosecutor stated in his summation, " she's absolutely the key witness." Nonetheless, the conclusion that the court's error, if any, was harmless beyond a reasonable doubt becomes inescapable when one considers that the motive Burnett had to accuse defendant – her natural desire to deflect suspicion of complicity in the murder away from herself and toward another – was already manifest to the jury without the precluded line of inquiry.

People v. Norcott, 15 A.D.3d at 19. One justice dissented, arguing that the defendant had been deprived of his constitutional right to confront an accuser and present a defense when this testimony was excluded. People v. Norcott, 15 A.D.3d at 24 (Andrias, J., dissenting).

Corby appealed to the New York State Court of Appeals, arguing that his constitutional right to full confrontation of the witness against him had been violated, that the violation had not been harmless, and that his conviction should be overturned. People v. Norcott, 6 N.Y.3d 231 (2005). The Court of Appeals affirmed the Appellate Division, again over a dissent. Id. Relying in part on Delaware v. Van Arsdall, 475 U.S. 673 (1986), the Court of Appeals found that the trial court had not abused its discretion by precluding the accusation-related line of inquiry and that no constitutional violation had occurred. People v. Corby, 6 N.Y.3d at 233. According to the Court of Appeals, the additional evidence that Corby sought to elicit through Burnett and Bourges "would have been cumulative and of little probative value [to the petitioner's] case." People v. Corby, 6 N.Y.3d at 236.

Corby then petitioned this Court for federal habeas corpus relief. Corby asserts, as he did before the New York Court of Appeals, that the right secured to him by the Confrontation Clause of the Sixth Amendment to the Constitution of the United States was violated when the trial court limited his cross-examination of Burnett, and that the trial court's error was not harmless under Supreme Court precedent. Magistrate Judge Fox issued his Report,

recommending conclusions that the state court correctly held that the cross-examination

restrictions placed on Corby were all imposed for legitimate reasons and that defense counsel

was granted sufficient latitude with the cross-examination of Burnett. Report 13. The Report

further concluded that the state court decision was not contrary to Supreme Court precedent,

which recognizes "the right of a trial court to place restrictions on a litigant's ability to cross-

examine a witness." Report 14. Judge Fox recommended that the petitioner's application for

habeas corpus be denied. Report 15.

In his Objection to the Report, Corby sought to clarify his earlier claims, arguing

that:

> Contrary to the Magistrate Judge's Report and Recommendation, the trial court's
> preclusion of petitioner's cross-examination of the sole witness to inculpate him
> regarding her belatedly developed hostility toward him that, after two years of silence
> for the first time gave her motive to falsely accuse him in particular and deflect blame
> from herself to petitioner for the crimes, violated petitioner's due process rights to
> confront the witness against him.

Objection 2. Corby's Supplemental Memorandum also suggested that this Court consider the

Second Circuit's decision in Brinson v. Walker, 547 F.3d 387 (2d Cir. 2008), which was

rendered after Judge Fox's Report was issued. In Brinson, the Second Circuit held that

preventing the defense from confronting a prosecution witness with evidence of his racial bias

during cross-examination violated the Confrontation Clause and was an unreasonable application

of established Supreme Court precedent.

## DISCUSSION

When reviewing a magistrate judge's report and recommendation, the Court "may

accept, reject or modify, in whole or in part, the findings or recommendations made by the

magistrate judge." 28 U.S.C.A. § 636(b)(1)(C) (West 2006). The Court must make a de novo

determination to the extent that a party makes specific objections to a magistrate judge's findings. Id.; see United States v. Male Juvenile, 121 F.3d 34, 38 (2d Cir. 1997). Considering Corby's timely objections and his supplemental memorandum of law, this Court will review the Report de novo.

Under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, § 104, 110 Stat. 1214, 1219, a federal court may set aside a state court conviction upon a showing by the petitioner that the state court's adjudication of the merits of his claim "resulted in a decision that . . . involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C.A. § 2254(d)(1); Williams v. Taylor, 529 U.S. 362, 376, (2000). This standard "falls somewhere between merely erroneous and unreasonable to all reasonable jurists." Overton v. Newton, 295 F.3d 270, 276 (2d Cir. 2002) (quoting Jones v. Stinson, 229 F.3d 112, 119 (2d Cir. 2000)). While the test requires "[s]ome increment of incorrectness beyond error, . . . the increment need not be great; otherwise habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." Jones v. Stinson, 229 F.3d 112, 119 (2d Cir. 2000) (quoting Francis v. Stone, 221 F.3d 100, 111 (2d Cir. 2000)).

The Supreme Court has established that a criminal defendant "states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness." Van Arsdall, 475 U.S. at 680 (emphasis added); see also Davis v. Alaska, 415 U.S. 308, 318 (1974). The question presented here is whether the trial court unreasonably applied this standard when it prohibited all cross-examination designed to show a particular form of bias on

the part of Burnett – specifically, that Burnett's belated accusation of Corby was the product of retaliation for his reported accusation of Burnett or an attempt to shift blame in light of that accusation.

It has long been established in this country that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const. amend. VI. The Confrontation Clause requires that a criminal defendant be afforded a meaningful opportunity to cross-examine witnesses against him in order to show bias or improper motive for their testimony. See Pennsylvania v. Ritchie, 480 U.S. 39, 51 (1987). A criminal defendant "states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors could appropriately draw inferences relating to the reliability of the witness.'" Van Arsdall, 475 U.S. at 680 (quoting Davis, 415 U.S. at 318).

In Delaware v. Van Arsdall, the Supreme Court held that the trial court had improperly prohibited the defense counsel from cross-examining the prosecution's witness about the recent dismissal of a public drunkenness charge against the witness. The Supreme Court held that a "reasonable jury might have received a significantly different impression of [the witness'] credibility had respondent's counsel been permitted to pursue his proposed line of cross-examination. Id. at 680.

> By thus cutting off all questioning about an event that the State conceded had taken place and that a jury might reasonably have found furnished the witness a motive for favoring the prosecution in his testimony, the court's ruling violated respondent's rights secured by the Confrontation Clause.

Van Arsdall, 475 U.S. at 679.

Similarly, in Davis v. Alaska, a witness had testified at trial that he had seen the

defendant engaged in suspicious activity on the day of the alleged robbery near the spot where

the theft had occurred. Id. at 310. During cross-examination, the trial judge prohibited defense

counsel from asking whether the witness was then on juvenile probation for burglary. Id. at 311.

Defense counsel argued that it was not seeking to introduce the juvenile adjudication as a general

impeachment of the witness' character as a truthful person but to make clear to the jury that, at

the same time as the witness was assisting the police in identifying the defendant, he was on

probation for burglary and therefore may have slanted his testimony in the prosecution's favor

either to shift suspicion away from himself or to avoid jeopardizing his probation by failing to

cooperate. Id. The Supreme Court found that failing to allow this specific line of inquiry

constituted a Confrontation Clause violation and overturned Davis' conviction:

> We cannot accept the Alaska Supreme Court's conclusion that the cross-examination
> that was permitted to defense counsel was adequate to develop the issue of bias
> properly to the jury. While counsel was permitted to ask Green whether he was
> biased, counsel was unable to make a record from which to argue why Green might
> have been biased or otherwise lacked that degree of impartiality expected of a witness
> at trial. On the basis of the limited cross-examination that was permitted, the jury
> might well have thought that defense counsel was engaged in a speculative and
> baseless line of attack on the credibility of an apparently blameless witness or, as the
> prosecutor's objection put it, a 'rehash' of prior cross-examination.

Davis, 415 U.S. at 318. As in the instant case, the Alaska Supreme Court had found that, during

trial, defense counsel had been afforded multiple opportunities to cross-examine the witness "in

considerable detail concerning the possibility of bias or motive." Davis v. State, 499 P.2d 1025,

1036 (Alaska 1972). According to the state court,

> Counsel alluded both to possible ulterior motives of the [witness] and to the
> possibility that the [witness'] identification arose from apprehension. The [witness]
> responded that he felt no anxiety or apprehension about the safe being discovered
> near his home. While this denial was possibly self-serving, the suggestion was
> nonetheless brought to the attention of the jury, and that body was afforded the
> opportunity to observe the demeanor of the witness and pass on his credibility.

Id. The Supreme Court of the United States rejected this conclusion, holding that, regardless of other biases held by the witness that may have been presented to the jury, when defense counsel was prohibited from asking the witness about his probation status, the trial court violated the defendant's constitutional right to confront witnesses. Davis, 415 U.S. at 315.

In reviewing the instant habeas petition, this Court also has the benefit of a recent decision of the Second Circuit Court of Appeals, issued after the Magistrate Judge's Report, which further underscores what the Supreme Court had already made clear – that the ability to explore particular varieties of bias, and not merely the existence of reasons for bias in general, is essential to the proper exercise of the right to confront witnesses. In Brinson v. Walker, 547 F.3d 387 (2d Cir. 2008), the defendant, an African-American, had been prohibited from cross-examining the victim (and sole prosecution witness) in a robbery prosecution about whether the witness had been fired from his job after the robbery for refusing to serve African-American patrons. The Second Circuit affirmed the district court's decision that the state trial court had violated the defendant's Confrontation Clause rights when it barred defense counsel from cross-examining the witness regarding the witness' alleged intense racial bias. Id. at 394-95. The Brinson Court held that, "[g]iven the intensity and extremity of the bias on which Brinson sought to examine [the witness], and the likelihood that one possessing a bias of such intensity might distort his testimony against an object of his bias on account of it, we find that it was not within a trial court's reasonable discretion to preclude this cross-examination," and that the state court's ruling was not a reasonable application of federal law. Id.

In the instant case, although the record was sufficient to enable to the jury to perceive several potential grounds for bias on the part of Burnett, the exclusion of evidence regarding the alleged accusation eliminated a specific, prototypical ground for bias from the

jury's consideration. This retaliation-based bias, and/or bias stemming from a desire to shift

blame specifically to her alleged accuser, is distinct from other grounds suggested by the trial

record, such as fear-based bias stemming from threats the defendant made against the life of

Burnett's son, and greed-based bias rooted in the expectation that, if Corby were sent to jail,

Burnett could keep the money she had stolen from him. Tr. 725, 736. Bias stemming from

Burnett's reaction to the accusation is distinct from these other forms arising from different

underlying facts, and has a different emotional and psychological cast, all of which are factors

important for a jury responsible for gauging the credibility of a witness. Furthermore, retaliatory

or blaming-shifting bias offers a cogent explanation for why the witness, after two years of

silence, implicated the defendant when she did.

               As Judge Smith pointed out in his dissent from the New York Court of Appeals'

decision upholding the conviction, the trial testimony revealing Burnett's hostility toward the

defendant and other motives to lie

> and the other evidence connecting defendant to Mohammed and Burnett's apartment,
> could not demonstrate to the jury that Burnett had a motive to specifically implicate
> defendant. Nor could this testimony and evidence establish that defendant was the most
> plausible candidate for Burnett to implicate. What was demonstrated was Burnett's
> motive to lie as to her participation as an accessory to the crimes (i.e., a motive for self-
> preservation). Without the cross-examination testimony defendant could not demonstrate
> to the jury that Burnett had a reason to fabricate her testimony to falsely accuse defendant
> for the purpose of either: (1) shifting the blame from herself to defendant; or (2)
> retaliating against defendant for accusing her in the first place.

People v. Corby, 6 N.Y.3d at 239 (G.B. Smith, J., dissenting). The trial court does, of course,

"retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable

limits on cross-examination based on concerns about, among other things, . . . prejudice,

confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally

relevant." Van Arsdell, 475 U.S. at 679. The state courts upheld the trial court's exclusion of

the accusation-related cross-examination here on the grounds that it would have been "cumulative" of the other evidence of grounds for bias, been "of little probative value to defendant's case," and "caused jury speculation and confusion as to the truth of defendant's purported accusation." People v. Corby, 6 N.Y.3d at 236. Such authority cannot properly, however, be used to cut off "all questioning about an event the State conceded had taken place and that a jury might reasonably have found furnished the witness a motive for favoring the prosecution in [her] testimony." Van Arsdell, 475 U.S. at 679.

Here, Corby's Confrontation Clause rights were violated notwithstanding the wide-ranging cross-examination that was allowed, because even wide latitude to explore numerous grounds for bias does not extinguish the right to inquire into specific, prototypical forms of bias for which there is a significant, good faith basis in the factual record. Cf. id. at 680 ("We think that a criminal defendant states a violation of the Confrontation Clause by showing he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.'" (quoting Davis v. Alaska, 415 U.S. at 318)); Brinson, 547 F.3d at 394-95 (in light of intensity and extremity of bias on which cross-examination was sought and likelihood of distortion of testimony of one possessing such bias, "we find that it was not within a trial court's reasonable discretion to preclude this cross-examination").

In sum, because all inquiry into one prototypical form of bias was prohibited, the defendant's constitutional rights under the Confrontation Clause were violated. In reviewing this case, the New York Appellate Division and Court of Appeals cited the correct precedents – primarily Van Arsdall, 475 U.S. 673, and Davis v. Alaska, 415 U.S. 308 – but unreasonably

applied that standard when they upheld the complete preclusion of questions regarding a distinct form of bias material to the jury's determination of the witness' credibility.

In reviewing a petition for a writ of habeas corpus, if a court determines that an error has occurred, the court must then examine whether the error was harmless.  A petitioner "cannot obtain relief . . . unless application of a correct interpretation of that [Supreme Court] decision leads to the conclusion that his rights were violated." Cousin v. Bennet, 511 F.3d 334, 339 (2d Cir. 2008).  When a reviewing court finds error involving the Confrontation Clause, it should not reverse automatically but should instead apply harmless-error analysis. Van Arsdall, 475 U.S. at 683 (holding that Davis, 415 U.S. at 318, does not support an automatic reversal rule).  In the instant case, the Appellate Division held that, even if the challenged ruling was erroneous, it was harmless.  People v. Norcott, 15 A.D. 3d at 19.[3]

"[W]hen a state court explicitly conduct[ed] harmless error review of a constitutional error, [pursuant to Chapman v. California], a habeas court must evaluate whether the state unreasonably applied Chapman." Guiterrez v. McGinnis, 389 F.3d 300, 306 (2d Cir. 2004), see also Chapman v. California, 386 U.S. 18 (1967).  Under Chapman, the standard is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." Van Arsdall, 475 U.S. at 684.  Relevant factors to consider when reviewing a case include: (1) the importance of the witness' testimony; (2) whether the excluded testimony was cumulative;

---

[3]    The Court of Appeals found that no violation of the Confrontation Clause had occurred since Burnett's general bias had been "fully explored through other means" and "the precluded area involved cumulative matter already presented." People v. Corby, 6 N.Y.3d at 236 (citing People v. Chin, 67 N.Y.2d 22, 29 (1986)). That Court did not undertake a harmless error analysis.

(3) the presence or absence of corroborating or contradictory testimony on material points; (4) the extent of the permitted cross-examination; (5) and the overall strength of the prosecution's case. Id. As the Second Circuit has recognized, the Chapman standard is "defendant-friendly" Benn v. Greiner, 402 F.3d 100, 105 (2d Cir. 2005). "The burden of persuasion is on the government, meaning that if 'the matter is so evenly balanced that [the federal judge] feels himself in virtual equipoise as to the harmlessness of the error,' the petitioner should prevail." Lainfiesta v. Artuz, 253 F.3d 151, 158 (2d Cir. 2001) (quoting O'Neal v. McAninch, 513 U.S. 432, 435 (1995)).

The Appellate Division applied the correct Chapman rule, stating "an error of constitutional dimension at a criminal trial, such as defendant claims to have occurred here, is considered harmless if 'there is no reasonable possibility that the error might have contributed to the defendant's conviction and . . . it was thus harmless beyond a reasonable doubt.'" People v. Norcott, 15 A.D.3d at 19 (citing People v. Crimmins, 36 N.Y.2d 230, 237 (1975)).

Here, an assessment of each of the five Van Arsdall factors indicates that the preclusion of the cross-examination of Burnett was not harmless beyond a reasonable doubt. Van Arsdall, 475 U.S. at 684. The first factor – the importance of Burnett's testimony to the prosecution's case – strongly suggests that the trial court's error contributed to the defendant's conviction. Burnett was the only witness to affirmatively place Corby at the scene of the crime, as the prosecutor himself said during summation:

> Xanderia Burnett [is] absolutely the key witness. You don't believe her, go back there and acquit the defendant, no doubt about it. I concede that without her there is basically very little evidence to suggest the defendant participated in a robbery and a homicide.

Tr. 1195. The second and third Van Arsdall factors also indicate that there is a reasonable

likelihood that the defendant might not have been convicted had the trial court not prohibited cross-examination concerning Burnett's reaction to Corby's accusation. Burnett's excluded testimony was not cumulative. No other evidence was presented to the jury concerning Bourges' report that Corby had accused Burnett of committing the murder. The possibility of a retaliatory motive or a specific motive for seeking to shift the blame to the Defendant as opposed to other participants in the crime – prototypical forms of bias  thus were not raised before the jury, which could on either basis have found Burnett to be a much less credible witness.

Similarly, with regard to the third factor, the trial proof against Corby was relatively weak without Burnett's testimony. There were phone records demonstrating that calls were exchanged during the relevant period between the Florida home of Corby's parents and Mohammed; some papers in Mohammed's hotel room had handwritten notations of Corby's name and where he could be reached; and there was evidence that Corby was connected to Moe and Farrow, and that he was in the apartment at the time period of the murder. People v. Norcott, 15 A.D.3d at 18. It was only Burnett's testimony, however, that directly implicated Corby in the murder and robbery of Mohammed.

Since the accusation-related line of questioning was precluded entirely, the fourth Van Arsdall factor, the extent of cross-examination otherwise permitted, again indicates that the trial court's error contributed to Corby's conviction, as does the final factor, the overall strength of the prosecution's case. The precluded line of inquiry would have given the jury unique information that could not have been obtained through the other avenues of inquiry that were permitted. It would have explained the timing of the witness' confession the police, and why Burnett did not say anything for such a long period of time. The precluded testimony would also have given the jury a basis for understanding why the witness implicated Corby, as opposed

to someone else   a fact that cannot be explained by a mere motive to deflect blame from herself. Burnett's testimony was the lynchpin of the prosecution's case. As the dissenting Justice in the Appellate Division said:

> Given that Ms. Burnett was the People's primary fact witness, it cannot be said that, if defendant were able, on cross-examination, to establish her motive to lie, there was no reasonable possibility that a reasonable jury would have acquitted defendant. Ms. Burnett was the only one who placed defendant with a gun in her apartment and connected him with the robbery and murder and the disposal of the body . . . . To force the defense to question Ms. Burnett's motive to lie indirectly, without allowing it to ask the key question as to what made her change her mind, eviscerated the defense's cross-examination of this crucial witness and turned defendant's constitutional right to confront his accuser on its head.

People v. Norcott, 15 A.D.3d at 34 (Andrias, J., dissenting). Had the jury been permitted to hear the evidence that Burnett had been told that Corby accused her, and only then, after two years of silence, decided to accuse him, there is a reasonable likelihood that they would have decided that Burnett was not credible and not convicted Corby. The prohibited line of inquiry could have done "[s]erious damage to the strength of the State's case." See Davis, 415 U.S. at 319. As Corby and Burnett were the only two people at trial who knew exactly what happened during the murder and robbery, the "damaging potential" was high. See Van Arsdall, 475 U.S. at 684. This Court concludes that the Chapman standard was unreasonably applied in the instant case, given that all five Van Arsdall factors suggest that the Confrontation Clause error by the trial court contributed to Corby's conviction, such that the error could not have been harmless beyond a reasonable doubt.

## CONCLUSION

Corby's petition for a writ of habeas corpus is granted. The Court respectfully declines to adopt the Report and Recommendation.

Petitioner must be released unless, within ninety (90) days, the state commences

prosecution. The Clerk of the Court is respectfully requested to enter judgment granting the petition and close this case.

The judgment and the commencement of the ninety-day period are stayed until all appellate proceedings are completed and a final mandate is received by this Court.

SO ORDERED.

Dated: New York, New York
       March 24, 2011

_____
LAURA TAYLOR SWAIN
United States District Judge